

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed September 27, 2016

_____
United States Bankruptcy Judge

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 13-35115-SGJ-7 |
| WORLDWIDE DIAMOND | § | (Chapter 7) |
| VENTURES, LP, | § | |
|     Debtor. | § | |

_____

| | | |
|---|---|---|
| ROBERT MILBANK, JR., TRUSTEE, | § | |
|     Plaintiff, | § | |
| v. | § | Adversary No. 15-03121-SGJ |
| | § | |
| SHARPSHOOTER II, INC., | § | |
| | § | |
|     Defendant. | § | |

**MEMORANDUM OPINION AND FINAL JUDGMENT: (A) GRANTING SUMMARY JUDGMENT ON "REASONABLY EQUIVALENT VALUE" ISSUE; (B) AVOIDING CONSTRUCTIVE FRAUDULENT TRANSFER; AND (C) AWARDING MONETARY DAMAGES TO BANKRUPTCY TRUSTEE**

**I.     INTRODUCTION: THE TALE OF THE PINK DIAMOND**

The above-referenced adversary proceeding (the "Adversary Proceeding") pertains to an alleged fraudulent transfer involving a *6.32 carat "Brown/Pink natural fancy diamond"* (hereinafter the "Pink Diamond"). The debtor-company, Worldwide Diamond Ventures, LP (the

1

"Debtor"), purchased the Pink Diamond for the aggregate sales price of $600,000, approximately two-and-a-half years before the Debtor filed Chapter 7 bankruptcy. The Debtor quite clearly overpaid for the diamond. But there is so much more. The facts in this Adversary Proceeding are rather sensational, to say the least.

The story begins in the year 2010. Starting then and at most times prior to its 2013 bankruptcy filing, the Debtor promoted itself as a partnership that specialized in the arbitrage of high quality, unique diamonds.[1] More specifically, the Debtor was in the business of raising private investments from individuals for the alleged purpose of buying diamonds, at hopefully below wholesale prices (supposedly from cutters or exclusive foreign sources), and then reselling them through various channels to create a profit. Things did not turn out as planned. While the Debtor's financial history is hardly clear, it appears that approximately $5 million of private investor money was raised, and only about $2.2 million of that was actually spent on diamonds—most of which were *not* resold at a profit.[2] The unrefuted evidence was vague as to where all the other investment funds went[3]—but there were a few rather interesting explanations, one in particular involved a multi-million dollar loan supposedly made by the Debtor to a third-party, which loan was allegedly collateralized with a Rembrandt painting housed in a storage facility in Sarasota, Florida.[4] As was typical with this Debtor, disappointment was sure to follow. The loan was not repaid and no Rembrandt painting was recovered to pay off the loan.

---

[1] DE # 1, ¶ 6. The use of the characters "DE # _" herein refers to the Docket Entry Number at which a pleading appears in the docket maintained by the Bankruptcy Clerk in this Adversary Proceeding.

[2] TAPP 420-423; TAPP 550. "TAPP" refers to the Trustee's Appendix in support of the Trustee's Second Motion for Summary Judgment, which Appendix is found at DE # 33.

[3] Two former principals and a former lawyer for the Debtor have recently been indicted on federal charges stemming from the alleged diamond investment strategy.

[4] TAPP 460-462 & 572.

The Rembrandt that "was not there" is not even the strangest of all transactions in which the Debtor allegedly endeavored. The Debtor's principals have also represented that the Debtor lent money to certain third parties that were going to bring gold dust to the United States from the African country of Ghana, which gold dust could then be sold for a profit.[5] As with the transaction involving the Rembrandt, there was no loan repayment and no gold dust ever materialized.

In any event, the Chapter 7 bankruptcy trustee (the "Bankruptcy Trustee" or the "Trustee") alleges that the Debtor grossly overpaid for the aforementioned Pink Diamond, and the transaction amounted to a constructive fraudulent transfer. The Trustee has now sued the seller of the Pink Diamond—a Texas corporation known as Sharpshooter II, Inc. (the "Defendant" or "Sharpshooter"), pursuant to sections 544 and 550 of the Bankruptcy Code and Texas Business and Commerce Code §§ 24.001 *et seq.*, seeking recovery for the difference between the value of the Pink Diamond and the $600,000 the Debtor paid for it.

The Pink Diamond itself was actually brought into the bankruptcy court at one hearing in a tiny plastic zip-lock bag (along with a jewelry expert to verify its authenticity).[6] It was—in a word—breathtaking. The Pink Diamond was square with slightly rounded corners, set in a platinum band, with triangular shaped colorless (white) diamonds on the sides. For a bankruptcy judge, a day in court does not get much better than this.[7] But in all seriousness, the evidence presented in the Adversary Proceeding was overwhelming and unrefuted that the Debtor

---

[5] TAPP 424 & 429.

[6] TAPP 603-605.

[7] Indeed, the author of this opinion is inclined to believe that the late film star Marilyn Monroe had it absolutely right, about the potential for diamonds being a girl's best friend. *See Gentlemen Prefer Blondes* (Twentieth Century-Fox Film Corp. 1953).

3

significantly overpaid for the Pink Diamond.  The Trustee in this case ultimately entered into a court-approved arrangement to have the Pink Diamond offered for public bids by the Sotheby's auction house in New York, at its widely advertised "Magnificent Gems" international auction, and the best bid submitted was a disappointing $210,000.  This bid was within the general range of other prices at which the Pink Diamond had been sold, during its known history of being bought and sold.  Apparently the Pink Diamond was not dark pink enough to be in the extremely rare category (it is brownish pale pink).  Perhaps if the Pink Diamond contained a unique flaw in the center, which resembled the image of a "leaping panther," which might be seen when held in the light a certain way, it would have proved to be much more desirable than it has turned out to be.[8]  In any event, the Bankruptcy Trustee has presented overwhelming evidence that the Debtor received less than reasonably equivalent value for the $600,000 it paid at a time when there were many creditors and the Debtor was insolvent.  This court holds that there is no genuine issue of material fact in dispute here and the Trustee is entitled to summary judgment as a matter of law.  The court's reasoning is set forth below.

## II.    JURISDICTION, VENUE, STATUTORY AUTHORITY, AND PROCEDURAL POSTURE

### *A.    Jurisdiction.*

As noted, this is a fraudulent transfer action.  Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding, pursuant to 28 U.S.C. § 1334(b).  This bankruptcy court has authority to exercise bankruptcy subject matter jurisdiction pursuant to 28 U.S.C. § 157(a) & (c)

---

[8] This is, of course, a reference to The Pink Panther series of comedy films, the first of which was released in the year 1963, featuring the bumbling French Inspector Jacques Clouseau (originally played by actor Peter Sellers).  *See The Pink Panther* (United Artists 1963).  The "Pink Panther" was the name of a large and valuable pink diamond, the theft of which was the center of the plot in certain of the movies.  The diamond was nicknamed the "Pink Panther" because of the alleged image of a leaping panther at its center.

and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core proceeding in which this court has statutory authority to issue final judgments, pursuant to at least 28 U.S.C. § 157(b)(2)(H).

The Defendant did not file a proof of claim in this bankruptcy case, and originally demanded a jury trial and did not consent to the bankruptcy court issuing a final judgment. Thus, originally, this court did not have Constitutional authority to adjudicate this Adversary Proceeding.[9] However, at a bankruptcy court status conference held on July 7, 2016, the Defendant withdrew on the record its demand for a jury trial and its non-consent to bankruptcy court adjudication. Thus, this court has Constitutional authority to enter a final judgment in this Adversary Proceeding.[10]

### B. Venue.

Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Debtor's chapter 7 case was filed in this district.

### C. Statutory Authority.

The statutory authority that applies here is: (a) Bankruptcy Code section 544(b), which permits a bankruptcy trustee to avoid any transfer of an interest of a debtor in property that is avoidable under applicable law by a creditor holding an unsecured claim; (b) Bankruptcy Code section 550, which permits a bankruptcy trustee to recover property transferred and avoided pursuant to section 544, or the value of such property from (among others) the initial transferee; and (c) Section 24.006(a) of the Texas Business and Commerce Code (the "Texas Uniform

---

[9] *See, e.g., Exec. Benefits Ins. Agency v. Arkison,* 134 S. Ct. 2165 (2014).

[10] *Wellness Int'l Network, Ltd. v. Sharif,* 135 S. Ct. 1932 (2015).

Fraudulent Transfer Act" or "TUFTA")—which is one example of the "applicable law" that a "creditor holding an unsecured claim" can utilize, as contemplated by Bankruptcy Code Section 544—and provides that a "transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . ."[11] Note that a cause of action with respect to a fraudulent transfer under section 24.006(a) of TUFTA must be brought within four years of the transfer pursuant to Section 24.010(a)(2) of TUFTA.

### D.     *Procedural Posture.*

There were never many disputed facts in this Adversary Proceeding. The Defendant admitted that the Debtor transferred $600,000 in funds to it in exchange for the Pink Diamond within four years before filing bankruptcy.[12] There was no genuine dispute that there were present creditors when it happened. However, the Defendant: (a) disputed "insolvency" at the time or as a result of the transfer; (b) disputed that the Debtor did not receive "reasonably equivalent value" in exchange for the $600,000; and (c) raised the affirmative defense of statute of limitations.[13] On June 1, 2016, the Trustee filed his first "Motion for Partial Summary Judgment,"[14] only on the "insolvency" element of Section 24.006(a) of TUFTA and on the Defendant's affirmative defense of statute of limitations. The court granted that first motion for

---

[11] Tex. Bus. & Com. Code Ann. § 24.006(a) (West 2015).

[12] DE # 10.

[13] *Id.* The Defendant originally asserted at least one more affirmative defense but formally withdrew it. DE # 10 (¶ 22) & DE # 26. The Defendant also seemed to articulate a couple of other affirmative defenses (DE # 10, ¶¶ 20 & 21), but they do not seem to fit squarely within any available affirmative defense and/or have been implicitly abandoned by the Defendant.

[14] DE # 17-19.

6

summary judgment, in an order dated July 13, 2016, and for reasons stated orally in court.[15] Specifically, the court concluded that the Debtor had been "insolvent" as a matter of law, both on a balance sheet basis (applying a "retrojection" theory—since the Debtor's books and records did not show the exact balances of assets and debts at the time of the transfers associated with the Pink Diamond, but did show insolvency at times shortly before and shortly after), and for the reason that, based on the undisputed facts, *the Debtor constituted a Ponzi scheme*—in that the Debtor made no money and only used investor money to re-pay other investors. Fifth Circuit authority has indicated that "a Ponzi scheme is, as a matter of law, insolvent from its inception."[16] The court also concluded, under the undisputed facts, that the Trustee timely and effectively accomplished service on the Defendant and there was no viable statute of limitations defense.

After the court ruled on these two issues, the Trustee requested permission to file a second motion for summary judgment on the issue of whether the Debtor received less than "reasonably equivalent value" when it received the Pink Diamond in exchange for $600,000—since this was the only remaining disputed issue and the Defendant's counsel announced it did not intend to put on any of its own evidence at trial. The court granted permission for this procedure. Thus, now before the court is the Trustee's Second Motion for Summary Judgment, with Brief and Appendix of evidence.[17] Based on the unrefuted evidence and arguments presented, this court holds that there is no genuine issue of material fact in dispute here, and the Trustee is entitled to summary judgment on the "reasonably equivalent value" issue.

---

[15] DE # 27.

[16] *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (citing *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006)).

[17] DE ## 31-33.

Accordingly, the Trustee is now entitled to a judgment against the Defendant for **$390,000**, which represents the difference between the amount transferred to Defendant for the Pink Diamond ($600,000) and the apparent value of the Pink Diamond at the time ($210,000), **plus pre and post-judgment interest at the federal judgment rate.** The undisputed facts and applicable legal authority are set forth below.

### III.   UNDISPUTED FACTS

#### A.   *Early Transactions Involving the Pink Diamond.*

1. The first transaction involving the Pink Diamond of which the Trustee had evidence was in 2007. As evidenced by an invoice dated August 1, 2007, Isaac Nussbaum Diamonds, located on Fifth Avenue in Manhattan, New York ("Nussbaum"), sold "1 RING WITH MOUNTING RA FBP GIA 6.32" to John T. Haynes, Inc. ("Haynes") for **$218,000**, or at $34,493.67 per carat.[18] Haynes is a Dallas, Texas jeweler and estate dealer who has testified twice credibly before the bankruptcy court. Haynes testified that Nussbaum is "a very well-known New York diamond dealer; deals in colored gemstones. He's not known for selling things cheap, particularly, but I thought [the Pink Diamond] was a pretty stone and - - and I thought I would, you know, try to promote it and make money, and it was not extremely successful after three years."[19]

2. During the three years that Haynes held the Pink Diamond, he widely marketed it in trade publications, including Rapaport Magazine.[20]

---

[18] TAPP 169; 622:14-17.

[19] TAPP 626:10-16; 680:4-19.

[20] TAPP 154-67; 626:17-627:25.

3. On June 3, 2010, Haynes sold the Pink Diamond to Olschwanger Designs ("Olschwanger"), a Dallas jewelry designer and seller, for **$250,000**.[21] A mere three days later, on June 7, 2010, Olschwanger sold the Pink Diamond to the Defendant, Sharpshooter, for **$295,000**.[22] Apparently, Olschwanger went out and found the Pink Diamond as an investment for the Defendant, Sharpshooter, whose principal, Ray Kurzon, told Olschwanger he was starting a diamond hedge fund.[23] In any event, Olschwanger made a quick $45,000 profit or finder's fee for his effort.[24]

4. A month later, in July 2010, the Defendant, Sharpshooter, sold the Pink Diamond to the Debtor. Starting in July 2010, the Debtor made the first of several payments to Sharpshooter for the Pink Diamond.[25] At that time, the Debtor did not have adequate funds to pay the full purchase price of the Pink Diamond in one payment, and instead made occasional payments, culminating in the final sale of the Pink Diamond by Sharpshooter to the Debtor on March 4, 2011.[26] As indicated earlier, the Debtor ultimately paid **$600,000** total for the Pink Diamond.[27] These $600,000 worth of payments, in exchange for the Pink Diamond, are what is in controversy in this Adversary Proceeding.

---

[21] TAPP 171.

[22] TAPP 172-73.

[23] TAPP 261:17-262.

[24] TAPP 257-58.

[25] TAPP 5 (showing checks to Sharpshooter starting July 15, 2010).

[26] TAPP 203; 400:19-25.

[27] TAPP 7 (showing 8 payments totaling $600,000 over an eight-month period).

### B. *The Debtor's Failed Efforts at Making a Profit on the Pink Diamond.*

5. From 2011 to 2013, the Debtor tried to market and sell the Pink Diamond, including featuring the Pink Diamond as the "featured item" at the "NFL Player's Wives Off the Field Fashion Show" in February 2011, when the National Football League's Super Bowl was held in Dallas, Texas.[28] The Debtor did not succeed in selling the Pink Diamond for several years.

6. On July 6, 2013, just prior to filing bankruptcy, the Debtor sold the Pink Diamond to Haynes (who, recall, had earlier owned the Pink Diamond from 2007 to 2010) for **$190,000**.[29]

7. Thus, in a six-year period, the Pink Diamond sold for **$218,000**, then **$250,000**, then **$295,000**, then **$600,000** (the Debtor transaction), then back down to **$190,000**.

8. On April 21, 2015, the Pink Diamond (pursuant to a court approved settlement between the Trustee and Haynes) was put up for bids in New York at Sotheby's annual "Magnificent Jewels" auction. The Pink Diamond had the benefit of multiple months of extensive international advertising in a glossy catalogue of other stunning jewelry. Disappointingly, the highest bid reached for the Pink Diamond was **$210,000**.[30]

9. So why did the Debtor pay $600,000—and could this possibly have been in the range of reasonableness? The undisputed evidence was that the Defendant, Sharpshooter, convinced the Debtor to purchase the Pink Diamond for $600,000 because it offered the Debtor

---

[28] TAPP 208; 303:19-304:11.

[29] TAPP 205.

[30] TAPP 228.

10

two grossly inflated appraisals of the Pink Diamond.[31]  The Debtor's former principal, Mr. Craig Otteson, testified that appraisals guided their purchase of the Pink Diamond.[32]

10.     One appraisal was prepared by two gemologists named Gino Chirico and Mopsy T. Chirico, for Olschwanger (recall that Olschwanger is the fellow who received the $45,000 finder's fee from Sharpshooter).  Gino's and Mopsy's appraisal pegged the "Full Replacement Value New" of the Pink Diamond at **$1,400,000**.[33]  To be clear though, the appraisal notes that the "Purpose & Function" of the appraisal was "Full Replacement Value New ONLY For Insurance Coverage."[34]

11.     On August 20, 2010, another gemologist named Steven Jarvis appraised the Pink Diamond's "Total Approximate Replacement Value" at **$1,011,200.00**.[35]

12.     One other known appraisal of the Pink Diamond exists.  On September 23, 2010, Olschwanger (again, the finder fee fellow) executed an appraisal which pegged the "Total Replacement Value" of the Pink Diamond at $350,000.[36]

13.     Olschwanger, when asked in deposition testimony, "Does the 600,000 reflect fair value at that time?" testified that $600,000 "is more than [he] would have sold it for."[37]  Olschwanger testified that the Jarvis appraisal at approximately $1 million was "high."[38]

---

[31] TAPP 375:24-376:20.

[32] TAPP 396:8-14.
[33] TAPP 195.

[34] *Id.*

[35] TAPP 189.

[36] TAPP 176.

[37] TAPP 290:7-13.

[38] TAPP 292:8-293:4.

Olschwanger conceded that said appraisal was over four times the amount that he paid for the Pink Diamond and that he had never "sold a diamond for four times what [he] paid for it."[39]

14.     Haynes, whom this court earlier noted seemed in all ways credible, and had no connection whatsoever with this Debtor or its principals or any of the other individuals mentioned in this opinion, testified live to the bankruptcy court that the "million-something" appraisal was "ludicrous."[40]

## IV.    LEGAL ANALYSIS

### A.    *Summary Judgment Standard.*

Summary judgment is appropriate only where "no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."[41]  A party seeking summary judgment bears the initial burden of identifying portions of pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.[42] The burden then shifts to the non-moving party to show that summary judgment should not be granted.[43]  In meeting its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."[44]

---

[39] TAPP 293:5-9.

[40] TAPP 635:9-11.

[41] *Floyd v. Amite Cnty. Sch. Dist.*, 581 F.3d 244, 247-48 (5th Cir. 2009).

[42] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[43] *See id.* at 324-25.

[44] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### B. *The Debtor Did Not Receive Reasonably Equivalent Value.*

Tex. Bus. & Com. Code § 24.006 provides that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[45]

As earlier noted, the Trustee has moved for summary judgment on the "reasonably equivalent value" element and, if he prevails, he will be entitled to judgment in his favor in the overall Adversary Proceeding. "To determine whether value is reasonably equivalent, courts examine all the circumstances surrounding a transaction, looking to whether there is a reasonable and fair proportion between what the debtor surrendered and what the debtor received in return."[46] "The salient issue is whether the estate lost value."[47]

The Debtor expended $600,000 for an asset that previously had been sold, at its highest price, at less than half of that figure. Looking backward, the Debtor paid twice as much as the asset had been sold for in the immediately prior transaction (on June 7, 2010), when Olschwanger sold the Pink Diamond to Sharpshooter for $295,000. The Debtor started making payments to Sharpshooter on July 15, 2010. In other words, for the transaction to have been a reasonably equivalent exchange of value, the Pink Diamond would had to have doubled in value in some 38 days.

---

[45] Tex. Bus. & Com. Code Ann. § 24.006(a) (West 2015).
[46] *Bowman v. El Paso CGP Co.,* 431 S.W.3d 781, 788 (Tex. App.—Houston [14th] 2014, pet. denied) (internal quotations omitted).

[47] *In re IFS Fin. Corp.*, 417 B.R. 419, 442 (Bankr. S.D. Tex. 2009), *aff'd*, 669 F.3d 255 (5th Cir. 2012).

Looking forward in time from the sale of the Pink Diamond, the Debtor paid three times as much as the asset was worth based on the next subsequent transaction, when the Debtor sold the Pink Diamond to Haynes for $190,000 on July 6, 2013. During the intervening two plus years, in order for the Sharpshooter-Debtor transaction to have been a reasonably equivalent exchange for value, the Pink Diamond must have lost approximately two thirds of its value between March 2011 and July 2013.  During the time that the Debtor owned the Pink Diamond (including when it was nearly finished making payments on the same), the Pink Diamond was put up for auction at a National Football League Super Bowl event hosted by the wives of NFL football players, in February 2011, where it did not sell.

In 2015, it was put up for auction at Sotheby's largest annual diamond auction with a reserve price of $220,000. The highest bid was $210,000.  There is no question of material fact that the Debtor and this bankruptcy estate lost value, when the Debtor paid $600,000 to Sharpshooter in exchange for the Pink Diamond, during the period from July 2010 to March 2011.  There is no credible refuting evidence to suggest that the Pink Diamond's value at any point came close to $600,000

### C.  *Based on the Unrefuted Evidence, the Court Will Attribute a Value of $210,000 to the Pink Diamond as of March 2011.*

The highest sales price for the Pink Diamond, excepting the transfer to the Debtor, was $295,000.  This came at a time (June 2010) in close proximity to the Debtor's purchase. However, the court is not convinced, based on the unrefuted evidence, that this $295,000 transaction was truly arms' length.  The only price that this court can conclude was truly fair and arms-length was the highest bid at the Sotheby's "Magnificent Jewels" auction—that occurred after months of international marketing.  While this was approximately four years after the Debtor paid $600,000, there is no evidence to suggest that the Pink Diamond either appreciated

14

or depreciated or was changed, improved or devalued in any way in the four-year intervening time period.  In fact, the $210,000 bid in the Sotheby's auction is squarely within the two prices that Haynes paid for the Pink Diamond ($218,000 in 2007 and $190,000 in 2013).  Haynes is the only person this court heard testify live and, as stated earlier, seemed credible and disinterested in the events involving this Debtor.   Accordingly, the court will issue final judgment in favor of the Bankruptcy Trustee for the difference between the $600,000 paid by the Debtor and $210,000, which the court concludes to have been the reasonable value of the Pink Diamond; in other words, a final judgment for $390,000.

## V.     CONCLUSION

For one reason or another, the Debtor grossly overpaid for the Pink Diamond.  There was no evidence to the contrary.  The Pink Diamond is beautiful.  It is eye-popping.  But it is not the Pink Panther.  And there was no evidence that it has ever been worth anywhere close to $600,000.

Section 24.006(a) of TUFTA, in conjunction with Section 24.008 of TUFTA (and in conjunction with sections 544 and 550 of the Bankruptcy Code) provide recourse and a remedy for the Trustee.  The Trustee is entitled to avoidance of the Pink Diamond transaction—to the extent of the difference between the value given by the Debtor ($600,000) and the value of the Pink Diamond ($210,000) and is entitled to recovery in the form of monetary damages in the amount of such difference ($390,000).

**WHEREFORE IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Bankruptcy Trustee is entitled to summary judgment and is awarded monetary damages against the Defendant, Sharpshooter II, Inc., in the amount of $390,000, plus pre- and post-judgment

interest at the federal judgment rate, per annum, accruing from March 4, 2011, until such date as this judgment is paid in full.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Bankruptcy Trustee shall be entitled to enforce and/or collect this Judgment to the fullest extent permissible under applicable non-bankruptcy law.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Bankruptcy Trustee shall be entitled to all writs and other process necessary to enforce this Judgment. This is a Final Judgment in this Adversary Proceeding.

#### END OF MEMORANDUM OPINION AND JUDGMENT ####